## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF INDIANA
## HAMMOND DIVISION

| | | |
|---|---|---|
| CHARLES D. WATT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | NO. 2:03-CV-137 |
| | ) | |
| STATE FARM MUTUAL AUTOMOBILE | ) | |
| INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

This matter is before the Court on: (1) Defendant State Farm Mutual Automobile Insurance Company's Motion for Summary Judgment, filed on August 31, 2004, and (2) State Farm Mutual Automobile Insurance Company's Motion to Strike Evidence Submitted in Opposition to Motion for Summary Judgment, filed on March 8, 2005.  For the reasons set forth below, the motion to strike is **GRANTED** and Paragraph "e" and paragraphs 3 and 4 of Plaintiff's Statement of Genuine Issues and the affidavit of Joseph Hoffman are **ORDERED STRICKEN**.  The motion for summary judgment is **GRANTED**.  The Clerk shall **ENTER FINAL JUDGMENT** in favor of Defendant, State Farm Mutual Auto Insurance Company, stating that the Plaintiff, Charles D. Watt, is entitled to no relief.

BACKGROUND

On February 9, 1999, the Plaintiff, Charles Watt ("Watt"), was involved in an automobile accident between himself and Charles Testa ("Testa").   (Dave Long Aff. at ¶ 4).   Apparently Watt was either stopped or slowing to a stop when he heard squealing brakes behind him and was, ultimately, rear-ended by Testa.   Watt alleges that, as a result of the accident, he suffered both back and neck injuries.[1]

Watt purchased automobile insurance policy number 575 7962-E01-14D from State Farm Mutual Automobile Insurance Company ("State Farm"), and that policy was in effect on February 9, 1999.  (Long Aff. at Ex. A.)   The policy provided uninsured motorist coverage up to $100,000 per person and $300,000 per accident. (*Id*).  The policy also provided medical payments coverage for up to $100,000 for each person. (*Id*).   Watt sought to collect benefits under this policy, and, although the policy limits for uninsured motorist coverage have now been paid to Watt, Watt's complaint alleges that State Farm breached the duty of good faith and fair dealing and that Watt is entitled to compensatory and punitive damages.

---

[1]In his summary judgment response, Watt insists he did not seek coverage for injuries to his back, citing paragraph 5 of Watt's affidavit and pages four and five of Dr. Kucharzyk's deposition. However, even Watt's counsel indicated, in his initial letter to State Farm advising that Watt had retained him, that Watt "sustained severe injury to his neck and back." (Long Aff. at Ex. E).  Furthermore, the very deposition testimony relied upon by Watt indicates Watt "related to mid-back pain and cervical pain." (Kucharzyk's Dep. at 5).

-2-

Watt originally filed his complaint in Lake Superior Court against State Farm on March 7, 2003. State Farm removed the action to this Court based on diversity jurisdiction. On August 31, 2004, State Farm filed its motion for summary judgment on Watt's claim. State Farm filed its motion to strike on March 8, 2005. Although Watt has had ample opportunity to submit a response, none has been filed. The instant motions are now ripe for adjudication.

DISCUSSION

The standards that generally govern summary judgment motions are familiar. Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper only if it is demonstrated that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In other words, the record must reveal that no reasonable jury could find for the nonmovant. *Karazanos v. Navistar Int'l Transp. Corp.*, 948 F.2d 332, 335 (7th Cir. 1991); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986). In deciding a motion for summary judgment, a court must view all facts in the light most favorable to the nonmovant. *Anderson*, 477 U.S. at 255; *Nucor Corp. v. Aceros Y Maquilas De Occidente*, 28 F.3d 572, 583 (7th Cir. 1994).

-3-

The burden is upon the movant to identify those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits," if any, that the movant believes demonstrate an absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the movant has met this burden, the nonmovant may not rest upon mere allegations but "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Becker v. Tenenbaum-Hill Assocs., Inc.*, 914 F.2d 107, 110 (7th Cir. 1990); *Schroeder v. Lufthansa German Airlines*, 875 F.2d 613, 620 (7th Cir. 1989). "Whether a fact is material depends on the substantive law underlying a particular claim and 'only disputes over facts that *might affect the outcome* of the suit under governing law will properly preclude the entry of summary judgment.'" *Walter v. Fiorenzo*, 840 F.2d 427, 434 (7th Cir. 1988) (citing *Anderson*, 477 U.S. at 248).

"[A] party who bears the burden of proof on a particular issue may not rest on its pleading, but must affirmatively demonstrate, by specific factual allegations, that there is a *genuine* issue of material fact which requires trial." *Beard v. Whitley County REMC*, 840 F.2d 405, 410 (7th Cir. 1988) (emphasis in original); *see also Hickey v. A.E. Staley Mfg.*, 995 F.2d 1385, 1391 (7th Cir. 1993). Therefore, if a party fails to establish the existence of an essential element on which the party bears the burden of proof at trial, summary judgment will be appropriate. In this situation, there can be "'no

genuine issue as to any material fact', since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

As this matter comes before the Court pursuant to diversity jurisdiction, the Court "must apply the law of the state as it believes the highest court of the state would apply it if the issue were presently before that tribunal." *State Farm Mut. Ins. Co. v. Fate*, 275 F.3d 666, 669 (7th Cir. 2001). Because neither party raised a conflict of law issue, the applicable law is that of Indiana, the state where this Court sits. *Indiana Ins. Co. v. Pana Cmty. Unit Sch. Dist. No.8*, 314 F.3d 895, 900 (7th Cir. 2002) ("Courts do not worry about conflict of laws unless the parties disagree on which state's law applies.").


Facts Relating to Medical Care

At the accident scene, Watt complained of pain to his back and neck, but refused medical attention. (Harden Aff., Ex. M at 00935, 001024). Later that day, Watt went to the St. Anthony emergency room where he complained of strain to his neck. (*Id.* at 00938-939, 001024-1025). Watt was diagnosed with a neck strain. (*Id*).

Watt began physical therapy a week after the accident and began experiencing some improvement within a month. (*Id.* at 001031, 001053, 001049, 001111). On March 12, 1999, Watt exacerbated his back injury

shoveling snow.  (*Id.* at 001142).  Thereafter, on April 14, 1999, Watt visited Dr. Donald Kucharzyk of the Orthopaedic Pediatric & Spine Institute for an evaluation of his neck. (*Id.* at 001122-23).   Dr. Kucharzyk diagnosed post-traumatic whiplash syndrome with pre-existing cervical spondylosis with acute spondylotic herniated nucleus pulposus at the C4-5 and C5-6 vertebrae (i.e. herniated discs). (*Id*).  Dr. Kucharzyk also noted that Watt had previously suffered herniated disks in his back prior to the accident.  (*Id*).  It is unclear from Dr. Kucharzyk's report whether the herniated disks in Watt's back are old or new.

Watt underwent a series of additional treatments including MRI's and physical therapy.  (*Id.* at 001031, 001053, 001058-62, 001090-92, 001194, 001191-93).  In September 1999, Watt returned to work and Dr. Kucharzyk released Watt from his care the following month.  (*Id.* at 001138, 001158).


State Farm's Investigation

Watt promptly reported his accident to State Farm on February 11, 1999.  (Long Aff. at ¶ 7; Watt Aff. at ¶ 2).  For purposes of valuing Watt's uninsured motorist claim, State Farm assumed the uninsured driver was 100% at fault.  (Long Dep. at 8).  State Farm assigned the claim to Paul Sloan ("Sloan") who sent a letter to Watt on February 17, 1999, explaining Watt's medical payments coverage and asking him to sign and return a medical authorization form.  (Long Aff. at ¶ 8).

Sloan was an independent adjustor working under contract with State Farm, under David Long's ("Long") supervision. (Long Dep. at 5-6). Sloan was the adjustor on the file from February 1999 until March 2000. (Mohr Dep. at 18). Sloan was not as familiar with State Farm procedures as existing State Farm employees. (Long Dep. at 32). Therefore, a large part of his work product was reviewed by Long. (*Id*). Watt contends that, between February 1999 and March 2000, Sloan never evaluated the uninsured motorist's claim. However, this contention is based on the deposition of Michael Mohr ("Mohr"), a State Farm employee, who lacks personal knowledge of this fact. (Mohr Dep. at 34). Accordingly, State Farm has moved to strike this assertion. Upon due consideration, the motion to strike is **GRANTED** to the extent that it seeks to strike Watt's contention that Sloan never evaluated the claim. Paragraph "e" of Plaintiff's Statement of Genuine Issues is **ORDERED STRICKEN.**

Through the discovery process, Watt sought information regarding Sloan from State Farm. (Watt Aff. at ¶ 3). State Farm indicated to Watt that it cannot locate Sloan or produce documents describing his background, abilities, education, or experience. (*Id*).

State Farm received the medical authorization form and began requesting medical records as part of its investigation.[2] (*Id.* at ¶ 9).

---

[2]Although Watt denies that State Farm began an investigation of the claim, the denial is not supported by any evidence, and therefore cannot be considered by the Court.

In late May 1999, State Farm contacted Dr. Kucharzyk's office to find out when Watt would be returned to work. (Kucharzyk's Dep. at 48-49). Dr. Kucharzyk characterized this as "unusual." (*Id*). On June 7, 1999, Watt sent a letter to State Farm notifying State Farm that he had retained an attorney to pursue his uninsured motorist claim. (Long Aff. at ¶ 13).

During its investigation, State Farm reports that it learned the following:

> a.  On July 30, 1984, Plaintiff was treated at Methodist Hospital Emergency Room for back pain due to lifting steel while at work. (Harden Aff., Ex M at 001291)
> b. The accident occurred on February 9, 1999. (*Id.* at 000918).
> c. The Plaintiff refused medical treatment immediately after the accident, but complained of neck and back pain. (*Id.* at 000935, 001024).
> d.  The Plaintiff went home after the accident, cleaned up, and went to the St. Anthony Emergency Room complaining of strain to the lower part of his neck on the right side. He denied any other associated injuries. He was diagnosed with a neck strain. (*Id.* at 000938-000939; 001024-001025).
> e. A week after the accident, the Plaintiff started physical therapy for complaints of soreness to his neck, bilateral shoulders and shoulder blades, as well as intermittent headaches. (*Id.* at 001031, 001053).
> f. A month after the accident, it was noted that the Plaintiff had improved and felt better. (*Id.* at 001049, 001111).
> g. On or about March 12, 1999, the Plaintiff injured[3] his back shoveling snow. (*Id.* at 001142).
> h. An April 12, 1999 MRI of the left shoulder was unremarkable; MRI of thoracic spine was negative. (*Id.* at 001058-001062; 001194).

---

[3]Although this should perhaps be characterized as an "acute exacerbation," State Farm's characterization of it as an "injury" does not materially affect the outcome of this case.

i.   On April 14, 1999, the Plaintiff visited Dr. Kucharzyk for an evaluation of his neck.  Dr. Kucharzyk diagnosed post-traumatic whiplash syndrome with pre-existing cervical spondylosis with acute spondylotic herniated nucleus pulposus at C4-5, C5-6.  The patient told his doctor that in 1980 he fell off a bridge and herniated two lumbar disks.  (*Id.* at 001122-001123).

j.   On or about April 28, 1999, the Plaintiff injured his lower back hanging a door.  (*Id.* at 001144).

k.   The Plaintiff was released by his doctor to return to work on June 1, 1999 with no restrictions, because his doctor found the patient was "not having as much pain and problems as he had," was "progressing favorably, steady and better," the doctor could not "reproduce pain on compression or distraction," and the doctor found "for the most part, patient is doing quite well."  (*Id.* at 001128, 001184).

l.   On or about June 3, 1999, the Plaintiff injured his right shoulder playing basketball.  (*Id.* at 000952, 001134).

m.   The Plaintiff left a message for his doctor and stated that he could not return to work because of pain in his right shoulder.  (*Id.* at 000951-000953).

n.   On June 14, 1999, the Plaintiff saw Dr. Kucharzyk for pain to the right shoulder.  The doctor noted that the neck was improving.  The doctor did not feel that the Plaintiff could return to work due to stress, the status of his neck and shoulders and the Plaintiff's work status and work ethics.  (*Id.* at 001134-001135).

O.   On June 28, 1999, the Plaintiff saw Dr. Kucharzyk for shoulder pain. The doctor note indicated that the problem was possible tendonitis.  (*Id.* at 001125).

p.   On June 25, 1999, the Plaintiff reported to his physical therapist that he has shoulder pain when performing "throwing" activities.  (*Id.* at 001037).

q.   A July 5, 1999 MRI of the right shoulder revealed tendonitis and a partial tear, decreased space between the acromium and humeral head and mild degenerative changes in the right AC joint.  X-ray of the right shoulder showed no abnormalities.  (*Id.* at 001090-001092; 001191-001193).

r.   On July 20, 1999, Dr. John Mirro, M.D. diagnosed the Plaintiff with epigastric pain due to reflux disease. (*Id.* at 001132, 001238).

s.   A July 21, 1999 biopsy revealed the Plaintiff had a hiatal hernia.  (*Id.* at 001081).

t.   On August 25, 1999, the Plaintiff complained to his physical therapist that he has weakness in his right

-9-

shoulder and that he could not throw a tennis ball.  (*Id.* at 001170).

u.  On September 13, 1999, Dr. Kucharzyk noted good progress and that the patient was not having "any significant complaints."  The doctor also noted that the shoulder was stronger.  The doctor noted that he would see the patient back in "three week's time for final evaluation and probable discharge."  (*Id.* at 001138).

v.  The Plaintiff was released to return to work on September 20, 1999 with no restrictions.  (*Id.* at 001138, 001158).

w.  On October 8, 1999, Dr. Kucharzyk released the Plaintiff from his medical care.  (*Id.* at 001137).

x.  On August 24, 2000, the Plaintiff requested an evaluation from Dr. Nickolson for pain in both shoulders. The Plaintiff admitted that the headaches and neck pain were gone.[4]  (*Id.* at 001101, 001247-001248).

y.  Dr. Nicholson did not recommend surgery and noted that some of the Plaintiff's problems are "work related, especially the right shoulder."  The doctor stated "his exam is very good, he is very strong and I have a difficult time reproducing his symptoms."  The doctor also noted that it was hard to discern what was from the accident and what was from the carpentry profession.  Dr. Nicholson had no treatment plan for the Plaintiff.  (*Id.* at 001101).

z.  In November 2000, the Plaintiff requested an evaluation with Dr. Sweeney for pain in his shoulder.  Dr. Sweeney diagnosed right rotator cuff tendonitis.  Dr. Sweeney injected the Plaintiff's shoulder and noted significant improvement.  The doctor also noted "by history this does appear to be post-traumatic in nature."  (*Id.* at 001103-001104).

aa.  On March 26, 2001, the Plaintiff visited Dr. Sturgill for a neurosurgical consultation for pain in the neck, head, shoulder and upper back.  (*Id.* at 001269-001271).

bb.  Dr. Sturgill recommended surgery to remove allegedly ruptured discs.  (*Id.* at 001269-001271).

cc.  The Plaintiff asked Dr. Sturgill for something in writing to show that the headache and shoulder pain were related to the accident.  Dr. Sturgill reasoned that since the Plaintiff had no complaints prior to the accident, his

---

[4]Again, State Farm's characterizing may not be precise.  Rather than "gone", the report indicates that a lot of the headaches and crepititis have gone away.

symptoms must have been caused by the accident.  (*Id.* at 001273, 001285).

Watt does not dispute the accuracy of these facts, and a review of the record reveals that, except as noted by this Court above, State Farm has fairly stated these facts.

State Farm, after reviewing the medical records, determined that it had several remaining questions about Watt's injuries and medical history.  (Long Aff. at ¶ 14).  State Farm concluded that utilization review by an outside doctor would help aid in the claim investigation. (*Id*).  State Farm believed it needed the utilization because "[t]here appeared to be pre-existing medical conditions, prior lumbar herniations, symptoms migrating from one body part to another, stomach and hernia conditions, diagnostic studies ordered for portions of the body which appeared to not be from the accident, and diagnostic studies that were ordered without clinical documentation." (Long Aff. at ¶ 14).

On October 4, 1999, Dave Long, Paul Sloan's supervisor, forwarded Watt's medical records to the CorVel Corporation for a utilization review.  (Long Aff. at ¶ 15).  Long included various medical records and specifically referenced certain conditions such as spondylotic changes, scoliosis and two herniated discs that Watt suffered in 1980 when he fell from a bridge.  (Long Aff. at Ex. F).

Dr. Suresh Mahawar conducted the utilization review and provided his opinion on December 6, 1999. (Long Aff. at ¶ 16).  Dr. Mahawar opined: 1)  that Watt's upper back strain was related to the February

accident; 2) that Watt's cervical spondylosis and rotator cuff tendosis were pre-existing medical conditions; 3) and that Watt's acid reflux and hiatal hernia were pre-existing, but that the reflux was aggravated by the use of medication. (*Id.* at ¶ 16 and Ex. G).

The CorVel Corporation review performed by Dr. Mahawar indicates that Dr. Kucharzyk diagnosed Watt with "Pre-existing Cervical spondylosis with acute spondylotic herniated nucleus pulposes at C4-5 and C5-6." (Long Aff. at Ex. G). At least sometime prior to October 1999, State Farm knew Watt had two herniated disks. (Harden Aff., Ex. M at 001122-001124). But, a review of the records indicates Dr. Kucharzyk had not clearly stated that the herniated disks were related to the accident.[5] (*Id.* at 001122-001124).

On December 9, 1999, Long wrote to Watt's counsel forwarding the results of Dr. Mahawar's evaluation. (Long Aff. at ¶ 17). Long explained that State Farm had already paid $10,330 to Watt for medical payments and that, based on the medical review, State Farm would pay an additional $3,003.60. (*Id*). The letter further explained that State Farm was not paying $2,277 in bills that it attributed to pre-existing medical conditions. (*Id*). Finally, Long explained that if the parties could not agree on an amount due under the policy, arbitration was an option. (*Id*).

---

[5]At his deposition on December 11, 2004, Dr. Kucharzyk did relate Watt's shoulder injury to the herniated disks. (Kucharzyk's Dep. at 50-51).

Watt responded to State Farm on February 25, 2000, in a letter demanding that State Farm pay the full policy limits of $100,000, less the medical expense amounts already paid by State Farm. (*Id.* at ¶ 18). The letter also enclosed medical records, bills, and wage loss statements. (*Id*). Further, the letter acknowledges that State Farm would evaluate and advance the undisputed amount to Watt after which the parties would proceed to arbitration. (*Id*).

After Watt's demand was received, either Dave Long or Michael Mohr reviewed the claim. (Long Aff. at ¶¶ 19-20). Watt contends that the review was actually conducted by Mohr and merely approved by Long, but that is not material here. *See* Mohr Dep. at 45-64. Factors considered in valuing the claim included the medical utilization review report, how the accident occurred, how the impact occurred, how the body would react to the impact, the claimant's subjective complaints; objective findings in Watt's medical records, medical records and other evidence of Watt's pre-existing conditions. (Long Aff. at ¶ 20). Based on these factors, and his training and experience, Long found that the value of Watt's uninsured motorists claim was $35,371.40. (*Id*). If State Farm had found Watt's herniated disks to be *caused* by the accident, it would have likely valued the case higher than $35,000. (Long Dep. at 49-50). From March 2000 forward, State Farm did not reevaluate Watt's claim. (Mohr Dep. at 73-75 and 91-92).

On May 7, 2001, Mohr sent medical records to Evaluation Plus, apparently for a second utilization review. (Mohr Dep. Ex. 2 and Mohr Dep. at 22-27). The cover letter suggests that MRI films, which would have shown Watt's herniated disks, were not included with other medical records. (Mohr Dep. Ex. 2). The record before this Court does not reveal whether Evaluation Plus actually performed an evaluation, and it does not appear that any of State Farm's decisions were based on information from Evaluation Plus.

Facts Relating to Payments Made under the Policy

While State Farm was investigating Watt's claim, Watt requested that State Farm advance payment of his lost wages. (Long Aff. at ¶ 10). In response to this request, Dave Long approved an expense advance to Watt in the amount of $3,000 on May 25, 1999. (*Id.* at ¶ 11). Watt came to the State Farm office on May 27, 1999, and inspected the $3,000 draft and receipt, but ultimately refused to sign a receipt for the advance. (*Id.* at ¶ 12). On May 27, 1999, State Farm refused to allow Watt to have an attorney review the document State Farm wanted him to sign in order to obtain the $3,000, and instead withdrew the $3,000.[6] (Watt Aff. at ¶ 6). Although Watt contends that, at the time State Farm offered the $3,000 wage advance,

---

[6]Watt himself cites to the deposition of Mohr, which provides that the form was faxed to the attorney. (Mohr Dep. at 57-59). Although there is evidence to the contrary cited by Watt himself, this Court nonetheless accepts the version of events most favorable to Watt for purposes of the instant summary judgment motion.

State Farm knew (and later conceded) Watt had lost over $20,000 in wages, the citations relied upon by Watt do not establish this fact. While Mohr admits that State Farm eventually calculated Watt's lost wages at more than $20,000, nothing in the cited portions confirms State Farm had already reached that conclusion in May 1999.

On April 7, 2000, State Farm sent Watt a check for $35,371.40, the undisputed amount of the uninsured motorist claim. (Long Aff. at ¶ 22).  On June 14, 2000, Watt increased his settlement demand to policy limits of $100,000 plus payment of medical expenses under the medical payments coverage. (*Id.* at 23).

In August 2001, State Farm agreed to pay all of the medical bills in the file, even those it had formally rejected. (Mohr Dep. at 80-84).  Before the parties arbitrated this matter, State Farm paid all outstanding medical bills for Watt under the medical payments coverage: a total of $19,853. (Harden Aff. at ¶ 4).

State Farm submitted an arbitration submission in which it contested the issue of liability. (Arbitration submission at 3-4).[7] State Farm contested liability in its arbitration submission because, as a result of its investigation, Watt admitted under oath a version of the facts which was not known to State Farm when it initially

---

[7]According to Watt, the arbitration submission also denied that Watt suffered two herniated disks, but Watt provides no citations in support of this claim.  This Court is not obligated to scour the record for this information.  *Roger Whitmore's Auto Services, Inc. v. Lake County,* 424 F.3d 659, 664 (7th Cir. 2005). Therefore, this fact will not be considered by the Court.

assumed that Testa was 100% liable.  (Harden Aff. at Ex. M at 00927-00927).  The parties arbitrated this dispute on April 12, 2002, and the arbitrators awarded Watt $150,000 in damages.  (*Id.* at ¶ 6).  The award noted that the parties had stipulated the uninsured motorist coverage was $100,000 and that the claimant had received an advance of $35,371.40, which would be deducted from the $100,000.  (*Id.*).  The award further noted that the parties stipulated that the medical expenses in the amount of $19,853 were not being claimed as subrogation by State Farm.  (*Id.*)

The arbitration award was received by State Farm claim representative Yvonne Harden on April 22, 2002.  (*Id.* at ¶ 7).  Her Team Manger, Kelly Urycki, questioned whether State Farm had a right to offset the $19,853 in medical expenses.  (*Id*).  On May 7, 2002, Kelly Urycki directed Yvonne Harden to issue a check to Watt in the amount of $64,628.60 ($100,000 less the $35,371.40 already advanced).  (*Id.* at ¶ 8).  The check was provided to State Farm's counsel, who forwarded it to Plaintiff's attorney.  (*Id*).

Motion to Strike Affidavit of Joseph Hoffman

Plaintiff's Statement of Genuine Issues provides the following:

> 5.   Without making specific reference, the affidavit of Public Adjustor Joseph Hoffman provides an analysis of the Defendant's actions in this case that categorically provides that Defendant's action rise to the level of obdurate, willful, conscious, [sic] how can a company the size of State Farm have no documentation whatever

> about an individual who adjusted one of its
> claims in its office e [sic] for thirteen months.

(Plaintiff's Statement of Genuine Issues at 3).

Hoffman's affidavit, consisting of 36 paragraphs, is largely comprised of facts which are in the record and which Hoffman lacks personal knowledge of. Some of these facts appear to accurately reflect the record, while others may not. Paragraph 24 provides that "State Farm avoided documenting their opinions in the claim so a claim manager, or insurance regulator, could understand why the claim was being significantly undervalued and unreasonably delayed." (Hoffman Aff. at ¶ 24). And, the last paragraph, paragraph 36, provides that, "the mishandling of the claim was unreasonable, unfair and not consistent with the need to be 'prompt, courteous and efficient.'" (Hoffman Aff. at ¶ 36). Because Hoffman lacks personal knowledge to assert many of the facts in his affidavit, and has failed to set forth specific facts which justify the opinions expressed in paragraphs 24 and 36, as required by Rule 56(e) of the Federal Rules of Civil Procedure, his affidavit is **ORDERED STRICKEN**. *See Williams v. Seniff*,, 342 F.3d 774, 789 (7th Cir. 2003).


<u>Motion to Strike Paragraphs 3 and 4 of Plaintiff's Statement of Genuine Issues</u>

Paragraph 3 of Plaintiff's Statement of Genuine Issues provides that "Defendant did not focus on a proper resolution to this claim, and instead purposely delayed its resolution by bad actions and

-17-

inaction." Plaintiff cites to Long's deposition to support this assertion. (*See* Long Dep. at 23-24). But, unfortunately for Plaintiff, Long's deposition does not go nearly as far as the Plaintiff's statement. Furthermore, the Plaintiff's statement is a legal conclusion. Paragraph 4 of Plaintiff's Statement of Genuine Issues provides that, "Defendant has lost the most important piece of the file, the eyewitness to all events related to it for the 13 months after its inception." Plaintiff failed to cite to any evidence to support this whatsoever. Accordingly, State Farm's motion to strike paragraphs 3 and 4 of Plaintiff's Statement of Genuine Issues is **GRANTED**, and paragraphs 3 and 4 of Plaintiff's Statement of Genuine Issues are **ORDERED STRICKEN**.

Duty of Good Faith and Fair Dealing

Plaintiff seeks compensatory and punitive damages against State Farm, alleging State Farm breached its duty of good faith and fair dealing. Insurance contracts create a legal duty on the insurer to deal in good faith with the insured. *Erie Ins. Co. v. Hickman*, 622 N.E.2d 515, 518 (Ind. 1993). The Indiana Supreme Court has recognized a cause of action for the tortious breach of an insurer's duty to deal with its insured in good faith. *Erie*, 622 N.E.2d at 519. The insurer's duty of good faith and fair dealing includes "the obligation to refrain from (1) making an unfounded refusal to pay policy proceeds; (2) causing an unfounded delay in making payment; (3)

-18-

deceiving the insured; and (4) exercising any unfair advantage to pressure an insured into a settlement of his claim." *Erie*, 622 N.E.2d at 519.

However, the cause of action for good faith and fair dealing in insurance contracts does not arise in every situation where an insurance company erroneously denies an insured's claim. *Erie*, 622 N.E.2d at 520. Insurance companies are allowed to engage in good faith disputes about the amount of a valid claim or whether there is a valid claim at all without exposing themselves to this cause of action. *Erie*, 622 N.E.2d at 520.

The cause of action for bad faith and fair dealing in insurance arises where the insurer denies liability knowing that there is no rational, principled basis for the denial. *Freidline v. Shelby Ins. Co.*, 774 N.E.2d 37, 40 (Ind. 2002). The insured must show by *clear and convincing* evidence that "the insurer had knowledge that there was no legitimate basis for denying liability." *Freidline*, 774 N.E.2d at 40.

In Indiana, punitive damages may be predicated upon a breach of an insurer's obligation to exercise good faith only if there is clear and convincing evidence that the defendant acted with malice, fraud, negligence, or oppressiveness which was not the result of a mistake of fact or law, honest error or judgment, overzealousness, mere negligence, or other human failing. *Masonic Temple Ass'n of*

-19-

*Crawfordsville v. Indiana Farmers Mut. Ins. Co.*, 779 N.E.2d 21, 26 (Ind. Ct. App. 2002).

Although not explicitly stated, because State Farm ultimately paid the policy limits after the arbitration, it appears that Watt's claim is for undue delay in paying the policy limits. Watt's claims appear to arise from the fact that State Farm disputed the value of Watt's claim and took the matter to arbitration.

The instant case bears no obvious evidence of bad faith on the part of State Farm.  The insurer has no duty to promptly pay all claims without investigation.  In this case, State Farm did not refuse to provide Watt coverage; rather, State Farm attempted to settle for a reasonable sum.  After Watt disagreed with the amount that State Farm initially offered, State Farm attempted to investigate the matter through medical records.

Watt asserts that the medical records show State Farm knew of Watt's herniated disks and, therefore, should have adjusted his claim differently.  But, in reality, the record shows that State Farm did not deny the existence of the herniated disk.  Rather, State Farm took the position that the medical records did not establish, at least initially, that the herniated disks were *caused* by the accident. Based on the record before this Court, State Farm's position was not unreasonable.

Additionally, the fact that Watt's claim proceeded to arbitration does not show bad faith.  The policy provided that the amount of

damages would be decided by arbitration if the parties agreed to arbitrate. Watt's counsel agreed to arbitrate.

Although the arbitration award was $150,000, which is considerably greater than State Farm's settlement offer, the arbitration award itself does not show bad faith. That State Farm's evaluation of the claim was found incorrect by the arbitrators does not show bad faith. *See Erie, 622 N.E.2d at 523; see also Bartlett v. State Farm Mutual Auto. Ins.,* No. IP 01-0510-C-H/K, 2002 WL 31741473 (S.D. Ind. 2002)(holding that a verdict in a plaintiff's favor is not prima facie evidence of an insured's bad faith).

There is no evidence of unreasonable delay in processing Watt's insurance claims to constitute a breach of the duty of good faith and fair dealing. The record reflects that State Farm promptly began its investigation of Watt's claim upon receipt of the file. State Farm collected voluminous medical records and reviewed those records. When it identified questions in Watt's treatment, State Farm forwarded the records to an independent medical evaluator for analysis. Watt has not produced any evidence that a utilization review was improper under the circumstances of this case; namely, pre-existing injuries, new injuries or exacerbations, a gap in treatment, and allegations of reflux that appeared to State Farm to be unrelated to the accident.

Watt alleges that State Farm failed to provide evidence of Watt's herniated disks to utilization review. But, Watt has produced no evidence of this with regards to CorVel. While there is evidence that

MRI's were excluded from information forwarded to Evaluation Plus, a company similar to CorVel, there is no evidence that any response was ever received from Evaluation Plus, or that it had any impact on the decisions made regarding Watt.  More importantly, there is no evidence of a deliberate decision not to include the MRI's.

Watt claims the delay between the arbitration award and payment to Watt was too great, but even Watt's expert, Mr. Hoffman, testified during his deposition that State Farm's records show payment was made May 7, 2002, and that the delay between the April 2002 arbitration and May 7, 2002 was not unreasonable.  (Hoffman Dep. at 230-33).  While Hoffman's affidavit does claim unreasonable delay (claiming that payment was withheld until July 2002), this Court has stricken that affidavit.  Additionally, it is inconsistent with his later statement in his deposition and, based on the deposition testimony,  the statement in the affidavit appears to be made in error.

Watt notes that State Farm contacted Dr. Kucharzyk regarding when Watt would return to work.  While calling Dr. Kucharzyk is perhaps unusual, it does not demonstrate bad faith.

Watt also alleges that State Farm "lost" Sloan, and that this shows bad faith.  In response to discovery requests, State Farm did indicate that it cannot locate Sloan or produce documents describing his background, abilities, education, or experience.  But, Sloan was an independent adjustor working under contract with State Farm; he was not employed by State Farm.  Watt has not established his contention

-22-

of bad faith from the fact that Sloan is "lost" because State Farm has no duty to know Sloan's whereabouts.  Thus, Watt's claim of bad faith based on unreasonable delay must fail.

To the extent that Watt intended to bring a claim for an unfounded refusal to pay policy proceeds, that claim must also fail. Watt contends that State Farm denied liability in its arbitration submission without a reasonable, principled basis, but State Farm has stated a reasonable basis for its denial, and Watt has failed to challenge State Farm's claim.  State Farm contends that it initially assumed that Testa was 100% liable based on the version of events relayed by Watt.  But, when Watt's statement was taken under oath, he provided different or additional facts, such that it was reasonable to assign some of the fault to Watt.  Under those circumstances, a reasonable jury could not find that State Farm acted with bad faith in denying liability in its arbitration submission.

There was also no clear and convincing evidence presented that State Farm acted with the sort of malice, fraud, negligence, or oppressiveness necessary to warrant the award of punitive damages.

In sum, no clear and convincing evidence (indeed, no evidence at all) has been presented that demonstrates State Farm acted with the requisite state of mind in denying coverage, refusing to pay policy limits, or in delaying payment of policy proceeds.  Watt's bad faith claim must fail.

CONCLUSION

For the foregoing reasons, the State Farm's motion to strike is **GRANTED** and State Farm's motion for summary judgment is **GRANTED**; the clerk shall **ENTER FINAL JUDGMENT** in favor of Defendant, State Farm Mutual Auto Insurance Company, stating that the Plaintiff, Charles D. Watt, is entitled to no relief.


**DATED:  September 28, 2006**          **/s/RUDY LOZANO, Judge**
                                        **United States District Court**